[No. 15528. *En Banc.* July 15, 1920.]

# C. L. VICKERS *et al., Respondents,* v. MACHINERY WAREHOUSE & SALES COMPANY *et al., Appellants.*[1]

BANKS AND BANKING (31)—EVIDENCE (7)—JUDICIAL NOTICE. The courts must take judicial notice of the custom of attaching bills of lading to drafts and passing them along for collection.

BANKS AND BANKING (20, 31)—DEPOSITS FOR COLLECTION—DRAFT WITH BILL OF LADING ATTACHED—TITLE. A bank becomes the absolute owner of a draft drawn by a depositor upon a person at a distance, and unrestrictedly indorsed and accepted for deposit subject to private check; and it is immaterial that the same was forwarded for collection attached to a bill of lading for goods shipped and to be delivered to the drawee on payment of the draft.

SAME. It is also immaterial that the bank intended to charge interest on the amount advanced until payment of the drafts.

SAME (31, 33)—DRAFTS—TITLE TO PROCEEDS. In such a case, it is immaterial that, by the universal custom of bankers, the bank reserved the right to charge the amount back to the depositor in case of failure to collect the draft.

GARNISHMENT (56)—DEPOSITS IN BANK. The proceeds of a draft sent to a bank for collection cannot be garnished on a claim against the drawer where the bank became the absolute owner of the draft.

APPEAL AND ERROR (421)—REVIEW—CONCLUSIONS OF LAW. A finding upon undisputed facts, that a bank received a draft for collection and did not become the owner, is a conclusion only, and not binding upon the supreme court upon appeal.

BANKS AND BANKING (31)—RELATION BETWEEN BANK AND DEPOSITOR FOR COLLECTION—RIGHT TO CHARGE BACK AFTER COLLECTION. A bank having through its agent or correspondent bank collected a draft, drawn by its customer and deposited to the customer's private checking account, has no right to charge back any part of the amount.

Cross-appeals from a judgment of the superior court for King county, Ronald, J., entered March 1, 1919, upon findings in favor of the plaintiff, against a garnishee defendant, after a trial to the court. Reversed.

[1]Reported in 191 Pac. 869.

*Kerr & McCord* (*Wm. Z. Kerr,* of counsel), for appellants.

*S. H. Kelleran,* for respondents.

BRIDGES, J.—In January, 1918, the defendant Machinery Warehouse & Sales Company, which we will hereafter speak of as the "Machinery Company," doing business in the state of Illinois, sold to Vickers & Sons & Company, respondent and cross-complainant, of Seattle, Washington, often spoken of herein as the purchaser, a fifteen ton crane for the sum of $8,800. The machinery company made certain warranties of the crane, and, among the rest, one that it would pass Seattle inspection. The purchaser was to pay down before shipment $2,800, and thereafter, within due course, the crane was to be shipped to the purchaser at Seattle, and at the time of shipment the machinery company was to make a sight draft on the purchaser for the balance of the purchase price, to wit, $6,000. In compliance with this contract, the purchaser paid $2,800 in cash to the machinery company. This sum was paid by sending a Seattle draft to the machinery company through the Continental & Commercial National Bank of Chicago. Shortly after the receipt of the first payment, the machinery company loaded and shipped the crane to the purchaser at Seattle. It drew a sight draft against the purchaser, payable to the order of the Continental & Commercial National Bank of Chicago, of which it was a regular customer, for the balance of $6,000. The bill of lading was attached to the draft. This draft, with the bill of lading attached, was taken to the Chicago bank, and the latter, following its custom, deposited to the credit of the machinery company the whole of the $6,000, which deposit was at all times subject to the private check

of the machinery company. The Chicago bank then indorsed the draft to the National Bank of Commerce, in Seattle, the appellant, as follows:

"Pay to the Order of National Bank of Commerce without recourse on this bank, either as principal or agent, as to the quantity, quality or delivery of any goods covered by this draft, bill or bills of lading or other documents attached hereto, or herein referred to.

"Continental & Commercial National Bank of Chicago,                       W. W. Lampart, Cashier."

The draft so indorsed, together with the attached bill of lading, was immediately sent on to the appellant for collection. When the crane reached Seattle, the respondent examined it while it was still on the car, and found that it would not pass Seattle inspection because of certain defects. Notwithstanding the information thus obtained, the respondent paid the draft of $6,000 to the appellant and took up the bill of lading. Before the appellant had remitted the $6,000 to the Chicago bank, respondent brought suit in the superior court of King county, Washington, against the machinery company to recover $2,500 damages on account of the breach of warranty that the crane would pass Seattle inspection. At the same time it caused to be issued out of the superior court of King county writs of garnishment and attachment and served the same upon the appellant while it had in its hands the identical $6,000 which the respondent had so recently paid to it. Thereafter respondent found certain additional defects in the crane and amended its complaint against the machinery company, alleging additional breaches of warranty and seeking to recover damages in the sum of $5,000. Additional attachments and garnishments were issued on this amended complaint and served upon appellant while it still had the $6,000 paid to it in exchange for the draft and bill of lading. Very

soon after the commencement of this suit, both the Chicago bank and the machinery company were notified thereof. Respondent took judgment against the machinery company in the sum of $5,000, and now seeks to hold sufficient of the $6,000 paid appellant to satisfy that judgment.

The appellant answered the writs of garnishment and attachment, to the effect that it was not indebted to the machinery company in any sum, and that it did not have in its possession or under its control any personal property or effects belonging to it. The assistant cashier of the Chicago bank testified that, at the time the bank took the draft and bill of lading, there was no agreement or conversation between the machinery company and the bank concerning the terms or conditions upon which the latter should take the draft; that, following its custom, it discounted the draft, paying the full face thereof, and put the money to the credit of the account of the machinery company subject to its private check. He further testified that the bank bought the draft and became the owner of it; that, had the draft, or any portion of it, not been paid the bank, it, in accordance with universal custom, had and would have exercised the right to charge back the amount to the machinery company or look to that company for reimbursement. At the time the Chicago bank received notice that the $6,000 had been garnished, the machinery company had on deposit with it $3,000. It does not appear whether this balance of $3,000 was a part of the $6,000 which the bank had previously paid for the draft. The Chicago bank did not at any time charge any portion of the $6,000 back to the machinery company. The Chicago bank intended to charge back to the machinery company an amount equal to the interest on the $6,000 deposited to its

credit, for such period as might elapse between the time of such deposit and the payment of the draft. The trial court made findings substantially as we have set them out, but in addition thereto, found that the Chicago bank extended a conditional credit to the machinery company in the full amount of the draft, with the understanding that the bank would act as agent for the machinery company in the collection of the draft, and that it received the draft, not to be treated as cash, but merely as collateral, and that at no time did the bank or the machinery company have any intention that the bank would become the purchaser or owner of the draft. The court's conclusion was that $3,000 of the $6,000 in the hands of the appellant were subject to the garnishment, and judgment was thereafter entered in accordance with such conclusions. From this judgment, the garnishee defendant has appealed. The respondent has cross-appealed.

The question involved in both the appeal and the cross-appeal is, How much, if any, of the $6,000 in the hands of the appellant was subject to garnishment and properly applicable on respondent's judgment against the machinery company? A correct answer to this question depends upon the answer to another question: To whom did the money belong at the time of the service of the writ of garnishment?

There is a maze and tangle of authorities on this question. Much has been said in the briefs concerning the fact that the bill of lading was attached to the draft. We have come to the conclusion that the bill of lading does not and cannot in any way affect the decision of the case. The custom of attaching bills of lading to drafts and thus passing the drafts along for collection has become so universal that the court must take judicial notice of the procedure. A bank has

power to purchase a draft, but ordinarily it has not power to purchase machinery, and the purchase of a bill of lading would be the purchase of the machinery represented by it. Nor is a bank, even if it had the power, engaged in the business of purchasing machinery or other property the title to which is represented by a bill of lading. After all is said and done, the bill of lading is nothing more nor less than a bill of sale and is attached to the draft purely as a matter of convenience in the transaction of business, and in order that the bill of lading, which is the evidence of the title, will not be delivered before the draft is paid. *Lewis Leonhardt & Co. v. Small & Co.*, 117 Tenn. 153, 96 S. W. 1051, 6 L. R. A. (N. S.) 887; *California Savings Bank v. Kennedy*, 167 U. S. 362; *Marble Co. v. Harvey*, 92 Tenn. 115, 20 S. W. 427. The fact that a bill of lading was attached to the draft cannot alter the legal relationship between the Chicago bank and the machinery company concerning their rights or privileges in the draft.

When a bank takes a draft drawn on a person who resides at a distance, it becomes one of three things: (1) A simple collector or agent of the drawer; (2) an absolute purchaser and owner of the draft; or (3) a conditional owner thereof. When the bank acts only as agent of the drawer, it becomes a collector and nothing else. The maker of the draft is its unconditional owner till it is paid. When it is paid the bank becomes the owner of the proceeds and the debtor of the maker of the draft. If, however, the bank takes the draft and discounts it, and pays to the drawee the amount thereof, then, and under those circumstances, it is manifest that the bank has become something more than a collector or agent and has either a qualified or absolute ownership of the draft. When we speak of

one being the qualified owner, we mean any interest less than that of complete ownership, which would include the idea of a lien on the draft or holding it as security for moneys advanced.

Generally speaking, whether a bank becomes a simple agent for collection, an absolute owner, or a qualified owner, will depend on the circumstances surrounding the deal and the agreement between and the intention of the parties. Much the greater number and weight of authorities is to the effect that, where one brings a check or draft to his bank, and such check or draft is made payable to the bank or is unrestrictedly indorsed to it, and requests that the amount thereof be put to his credit subject to his private check, and the bank complies therewith, and nothing else is said or done, it will be conclusively presumed that the bank has become the unqualified and absolute purchaser and owner of the check or draft, and consequently the absolute and unqualified owner of any proceeds to be derived therefrom. We think the theory is sound. It agrees with the idea and view generally accepted by business; it is the natural and unstrained construction of the action of the parties, and has the additional virtue of definitely fixing and at once defining the legal relationships of the parties in many check and draft transactions. Of course, this rule would not apply where the bank pays or advances an amount materially less than the face of the check or draft and it is understood that the bank is to pay an additional sum when it has made collection. The correct rule, we think, is stated in 3 R. C. L. 524:

"When a check or other commercial paper is deposited in a bank, indorsed for collection, or where there is a definite understanding that such is the purpose of the parties at the time of the deposit, there is no question that the title to the paper remains in the

depositor. . . . If, on the other hand, there is a definite understanding at the time of the deposit that such paper is deposited as cash, it is clear that the title passes to the bank. But, where a check indorsed in blank is deposited without any definite understanding as to the way it is to be treated, but is credited by the bank to the depositor as cash, and is so entered upon the depositor's pass book, the question frequently arises whether the title to the check passes immediately to the bank, or remains in the depositor. *Prima facie* according to the weight of authority, the passing to the credit of the depositor, of a check bearing an indorsement not indicating that it was deposited for collection merely, passes the title to the bank. Still, according to the weight of authority, the rule above stated is not an absolute rule, and is *prima facie* merely, and yields to the intention of the parties, expressed or implied from the circumstances.''

The supreme court of the United States has fully passed upon this question in the case of *Burton v. United States*, 196 U. S. 283. There Mr. Justice Peckham said:

''There was no oral or special agreement made between the defendant and the bank at the time when any one of the checks was deposited and credit given for the amount thereof. The defendant had an account with the bank, took each check when it arrived, went to the bank, indorsed the check, which was payable to his order, and the bank took the check, placed the amount thereof to the credit of the defendant's account, and nothing further was said in regard to the matter. In other words, it was the ordinary case of the transfer or sale of the check by the defendant, and the purchase of it by the bank, and upon its delivery to the bank, under the circumstances stated, the title to the check passed to the bank and it became the owner thereof. It was in no sense the agent of the defendant for the purpose of collecting the amount of the check from the trust company upon which it was drawn. From the time of the delivery of the check

by the defendant to the bank, it became the owner of the check; it could have torn it up or thrown it in the fire or made any other use or disposition of it which it chose, and no right of defendant would have been infringed."

The court in that case further held that the trial court erred in submitting to the jury the question as to whether or not the bank became the absolute owner or purchaser of the check, stating that the testimony showed that it did become such owner and that there was nothing to submit to the jury. The following are a few of the cases supporting the doctrine which we have announced: *Thompson v. Riggs*, 5 Wall. (U. S.) 663; *Commercial Bank of Albany v. Hughes*, 17 Wend. (N. Y.) 94; *Metropolitan National Bank v. Lloyd*, 90 N. Y. 530; *Taft v. Quinsigamond National Bank*, 172 Mass. 363, 52 N. E. 387; *Noble v. Doughten*, 72 Kan. 336, 83 Pac. 1048; *In re State Bank*, 56 Minn. 119, 57 N. W. 336; *Lewis Leonhardt & Co. v. Small & Co., supra; Goetz v. Bank of Kansas City*, 119 U. S. 551; *Walker & Brock v. Ranlett*, 89 Vt. 71, 93 Atl. 1054; *Scott v. McIntyre Co.*, 93 Kan. 508, 144 Pac. 1002, L. R. A. 1915 D 139; 5 Cyc. 497.

It has been argued that the fact that the Chicago bank took this draft considering that it had the right to charge the same back to the machinery company if it were not paid, shows that the bank did not become the absolute owner of the draft; that it could not maintain the dual position of being the absolute owner and at the same time reserve the right to charge back if the draft were not paid. This argument is fully answered by the supreme court of the United States in *Burton v. United States, supra*, when it says:

"The testimony of Mr. Brice, the cashier of the Riggs National Bank, as to the custom of the bank when a check was not paid, of charging it up against

the depositor's account, did not in the least vary the legal effect of the transaction; it was simply a method pursued by the bank of exacting payment from the indorser of the check, and nothing more.''

In the case of *Noble v. Doughten, supra,* the court, in a case where the facts were very similar to those here, held that the bank became the absolute owner of the draft, and commenting on the argument that the power to charge back would change the character of the ownership, said:

''It may be conceded that if, after due and legal effort to collect the check, it should be dishonored, the bank would have the right to charge the amount of it to the depositor's account. Whether this right may be said to rest merely on the custom of banks, or whether the custom has been crystallized into a rule, and the right now may be said to be an implied condition attaching to the transfer of the paper, makes no difference. It is, nevertheless, in strictness, the right of an indorsee against an indorser, and hence is not in any sense inconsistent with ownership.''

In the case of *Scott v. McIntyre Company, supra,* discussing this exact question, the court said:

''We cannot regard the right of a bank receiving a draft for deposit to charge the amount back to the depositor if payment is refused, as having a determinating influence. Such a right on the part of the bank would seem to be an ordinary incident even of a deposit which is accepted as cash. The transaction is based on the supposition that the draft is going to be paid. A guaranty of payment often results from the indorsement, but, however evidenced, it should not militate against the theory of a passing of the title.''

To the same effect see: *Ayres v. Farmers' & Merchants' Bank,* 79 Mo. 421; *First Nat. Bank v. Armstrong,* 39 Fed. 231; *Walker & Brock v. Ranlett, supra;* *Brooks v. Bigelow,* 142 Mass. 6, 6 N. E. 766; *American*

*Trust & Savings Bank v. Gueder Mfg. Co.*, 150 Ill. 336, 37 N. E. 227.

The fact that the bank intended to collect from the machinery company an amount equal to interest on the sum advanced by the bank to the machinery company, during the period from such advancement until the payment of the draft, could not have the effect of making the bank a collector or conditional owner of the draft. The bank paid the machinery company the full amount of the draft. If it had deducted a reasonable sum for the use of the money, instead of waiting until the draft was paid, it could not be argued that such would have had the effect of lessening the bank's ownership of the draft. That the bank did not take out this discount when it bought the draft was for the convenience of the parties, for the reason that, at that time, no one could tell how long it would be before the draft would be paid.

We frankly concede that the conclusion to which we have come and the reasons for such conclusions are opposed to the theory and reasoning of some of the earlier decisions of this court. In the case of *Washington Brick, Lime & Mfg. Co. v. Traders National Bank*, 46 Wash. 23, 89 Pac. 157, this court, in substance, held that, under facts similar to those involved in this case, the bank did not become the owner of the draft; that it could not logically maintain the position of absolute owner and at the same time have the right to charge back. In the case of *Morris-Miller Co. v. Von Pressentin*, 63 Wash. 74, 114 Pac. 912, we held that the claim or the exercise of the right to charge back was not consistent with the theory of ownership. Substantially the same holding is found in the case of *American Savings Bank & Trust Co. v. Dennis*, 90 Wash. 547, 156 Pac. 559. But the more recent case of

*Old National Bank v. Gibson,* 105 Wash. 578, 179 Pac. 117, expressly overruled the case of *American Savings Bank & Trust Co. v. Dennis,* above, and, in our opinion, overruled the theory upon which the other Washington cases cited were decided. In the *Old National Bank* case, the facts were that Gibson gave one White his check on the Fidelity National Bank of Spokane. White took the check to the Old National Bank of Spokane and the amount thereof was deposited to his private account at that bank. But the deposit slip on which the check was listed provided that "Items other than cash are received on deposit with the express understanding that they are taken for collection only." The court held that the deposit so made by White was a conditional credit, and that the bank took the check, not as owner, but for collection. Later, however, White presented his private check for the whole amount of his private account and the bank paid the same. We held that, while the deposit in the first instance was a conditional credit and the bank did not become the owner of the check, yet, when later the depositor presented his check for the whole amount and the bank elected to and did pay it, the original relationship was changed and the bank became the owner of the check. While the facts of that case are not identical with the facts of this case, yet the reasoning there is the reasoning we have applied here.

. In what we have said we do not necessarily hold that those earlier cases were wrongly decided; we go no further than to hold that much of what is said in them is contrary to the great weight and number of decided cases and is not in harmony with the views of the business public in such transactions, which views have ripened into a general commercial custom.

Having decided that the Chicago bank became the

unqualified owner of the draft, it must follow that the money which was paid to its agent and correspondent, the appellant herein, to take up the draft was the property and money of the Chicago bank, and that the machinery company had no interest therein, and that the attempted garnishment was futile. We have not overlooked the fact that the trial court found that the Chicago bank received the draft simply for collection and that it did not become the purchaser thereof. That so-called finding was a conclusion. While we always pay great deference to the findings made by the lower court based upon the evidence, it is the duty of this court to draw its own conclusions. We think the learned trial court erred.

But had we followed the reasoning of our earlier cases on this subject, the ultimate result in this particular case must have been its reversal. If it be conceded that the Chicago bank did not become the owner of the draft, then it must be held that the transaction amounted to an equitable assignment to it of such portion of the proceeds of the draft as was necessary to repay it the amount it had advanced to the machinery company, which, indeed, was the full face of the draft and the total amount it had collected. The bank would have been the conditional owner of the draft and the machinery company the conditional owner of the money which had been paid to its credit in that bank. Till the draft was paid, the bank would have had the right to charge back to the machinery company the amount it had advanced, and the machinery company would have had the right to recall the draft. But this conditional relationship would have terminated when the draft was paid. At that time the bank would become the absolute owner of the proceeds of the draft and the machinery company its unconditional creditor.

After the payment of the draft, the bank would have had no right to charge back anything to the machinery company. The loan or advancement the bank had made would have been paid when the draft was paid. But it is argued that, when the Chicago bank learned of this litigation, the machinery company had on deposit with it the sum of $3,000, and that it was the duty of the bank at that time to charge back that sum. But the bank had no right so to do because the machinery company was not at that time indebted to the bank in any sum, the draft money having paid any indebtedness which it theretofore owed. *Fourth National Bank v. Mayer*, 89 Ga. 108, 14 S. E. 891; *Central Mercantile Co. v. Oklahoma State Bank*, 83 Kan. 504, 112 Pac. 114, 33 L. R. A. (N. S.) 954.

Suppose that, after the draft was paid, the Chicago bank had undertaken to charge back to the machinery company, the latter could rightfully have answered that it owed the bank nothing, and that the loan or advancement made by the bank had been paid by the very money which it then had in its hands. When this garnishment was served, neither the appellant nor the Chicago bank was indebted to the machinery company, or had any money in its hands in which the machinery company had any interest.

The judgment is reversed, and the cause remanded with instructions to dismiss the appellant out of the case.

ALL CONCUR.